# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| OLUWASEUN ARIJE, | * | |
| Plaintiff, | * | |
| v. | * | CIVIL NO. JKB-18-3119 |
| POINTCROSS LIFE SCIENCES, | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

*Pro se* plaintiff Oluwaseun Arije ("Plaintiff") filed suit alleging that his former employer, Pointcross Life Sciences ("Defendant"), discriminated against him based on his race in violation of Title VII of the Civil Rights Act of 1964, *see* 42 U.S.C. § 2000e-2(a). Now before the Court is the Defendant's motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). (Mot. Dismiss, ECF No. 18.) No hearing is required. *See* Local Rule 105.6 (D. Md. 2018). For the reasons set forth below, Defendant's Motion will be granted in part and denied in part.

## I. *Factual and Procedural Background*

On September 22, 2017, Arije filed a *pro se* complaint[1] against Pointcross Life Services in the District Court for the District of Columbia. (Compl., ECF No. 1.) The single-paragraph complaint accused the Defendant of "violat[ing] the Plaintiff's civil rights by discriminating against African-American employees with false written evaluations[,] . . . leading to hostile

---

[1] In summarizing the allegations of the Complaint, the Court construes all facts in the light most favorable to the plaintiff, as is required on a motion to dismiss. *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). Courts construe *pro se* complaints "liberally." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

conditions and the end of employment." (*Id.* at 2.) Arije alleged that, contrary to the evaluations, he had "performed-well [*sic*]," and that performance on projects was "often, if not always," evaluated "in front of other employees at meetings," suggesting that employees were aware of one another's progress and quality of work. (*Id.*) He also alleged that his name was frequently mispronounced "by the Defendant" in a way that was "reminiscent of a racial slur."[2] (*Id.*) Arije claimed loss of employment opportunities, damage to his reputation, and emotional distress. (*Id.*)

The Defendant moved to dismiss the case for lack of personal jurisdiction, improper venue, and failure to state a claim. (ECF No. 5.) Construing Arije's opposition as a motion to transfer, the court denied the motion to dismiss and ordered the case transferred to the District of Maryland. (Order at 2, ECF No. 12.) After transfer, the Defendant again moved to dismiss the Complaint for failure to state a claim. (Mot. Dismiss at 1.)

In his response, Arije advanced no legal arguments and, instead, put forth facts about his employment history with the Defendant that were not included in the original Complaint. (Opp'n Mot. Dismiss, ECF No. 22.) Allegations included in the response brief are summarized below.

Arije is African American. (*Id.* at 1.) He was hired by Pointcross Life Sciences in May of 2014 on a one-year contract as a "Non-Clinical Subject Matter Expert." (*Id.* at 2, 3.) In that role, Arije was a member of the "data standardization team" (*id.* at 3), and his duties related to "informatics knowledge, triaging toxicology datasets, . . . data extraction . . . and identifying [and resolving] data discrepancies." (*Id.* at 2.) Kristi Johnson was the "Team Lead Subject Matter." (*Id.*) She reported to Shree Nath, a Vice President. (*Id.*) The data standardization team included other subject matter experts, as well as a toxicologist, and an individual assigned to technical

---

[2] The Complaint does not allege the correct pronunciation of Arije's name. According to the Defendant, Plaintiff used the name "Kunle" at work. (Mot. Dismiss at 7.) Plaintiff alleged his name was often mispronounced as "Coon-le," with an "over emphasis [*sic*]" on the first syllable. (Compl. at 2.)

support. (*Id.*) One of Arije's fellow subject matter experts and the technical support person are both African American, but most of his peers and supervisors—including Johnson and Nath—are not. (*Id.* at 2, 4.)

For most of his tenure, Arije received generally positive feedback on his performance. (*See id.* at 2 ("I was informed numerous times by my superiors and coworkers that my work was engaged and productive."); *id.* at 3 ("I received essentially positive feedback during the three-month probationary period of my contract . . . .").) When "evaluated in person in front of other peers[,] [his] work was shown to have no or very few errors." (*Id.* at 4.) By contrast, "[o]thers employed doing data standardization [produced] work that contained more errors than [Arije's work]." (*Id.* at 3.)

At some point, management assigned Arije to a three-person team responsible for developing a "guide on data standardization and implementation" that would "outlin[e] intermediate instructions, helpful tips, and formulas on data standardization . . . for future use." (*Id.* at 3–4.) The nature of this guide was such that "[o]nly someone who knows what they are doing [and] is proficient in the matter would be asked to create [it]." (*Id.* at 4.)

Johnson and Nath "expressed hatred towards [Arije]" that he believed was "due to racist predispositions unrelated to work quality." (*Id.* at 2.) Johnson also engaged in other forms of "unprofessional behavior," including "unnecessarily yelling at employees," habitually arriving late, and gesturing during meetings with "only her middle finger raised." (*Id.* at 3–4.)

In late October 2014, Arije received a negative performance review by email, contrary to the performance-based feedback he had received up until that point. (*Id.* at 3.) The negative review "relied greatly on Johnson's evaluations," because, unlike other supervisors, she was co-located with Arije in Maryland. (*Id.* at 3.) Arije "vigorously defended [himself]" against the

3

negative review and eventually complained to the project manager that he believed the review was inaccurate and "dishonest," but his grievance was not addressed. (*Id.* at 4.) At some point either before or after the negative review, an employee in human resources and a senior member of the data standardization team left Pointcross, which Arije believed "facilitated" the "dishonest" evaluations of his work. (*Id.*) Arije was terminated on December 19, 2014. (*Id.*) On the same day, Morie Alpha, another African-American subject matter expert, was also terminated. (*Id.*)

## *II. Legal Standard for a Motion to Dismiss under Rule 12(b)(6)*

A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. An inference of the mere possibility of misconduct is not sufficient to support a plausible claim. *Id.* at 679. Courts must "accept the well-pled allegations of the complaint as true, . . . constru[ing] the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). Nevertheless, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "A pleading that offers 'labels and conclusions' or . . . 'naked assertion[s]' devoid of 'further factual enhancement'" will not suffice. *Iqbal*, 556 U.S. at 678 (alteration in original) (citation omitted) (quoting *Twombly*, 550 U.S. at 555, 557). Courts need not accept legal conclusions couched as factual allegations. *Twombly*, 550 U.S. at 555.

*Pro se* plaintiffs are held to a "less stringent standard" than lawyers, and courts construe their pleadings liberally, no matter how "inartfully" pled. *Erickson v. Pardus*, 551 U.S. 89, 94

(2007) (per curiam) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). Liberal construction is especially appropriate where a *pro se* plaintiff alleges civil rights violations. *Brown v. N.C. Dep't of Corrections*, 612 F.3d 720, 724 (4th Cir. 2010) (citing *Loe v. Armistead*, 582 F.2d 1291, 1295 (4th Cir. 1978)). Nonetheless, a *pro se* complaint must still meet the "minimum threshold of plausibility" under *Twombly* and *Iqbal*. *Robb v. Md. Aviation Admin.*, Civ. No. JKB-14-1421, 2014 WL 4056030, at *3 (D. Md. Aug. 15, 2014) (citing *O'Neil v. Ponzi*, F. App'x 795, 796 (2d Cir. 2010)). "While *pro se* complaints may represent the work of an untutored hand requiring special judicial solicitude, a district court is not required to recognize obscure or extravagant claims defying the most concerted efforts to unravel them." *Gough v. Bankers Life & Cas. Co.*, Civ. No. PJM-17-2341, 2018 WL 4567112, at *2 (D. Md. Sept. 21, 2018) (quoting *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 391 (4th Cir. 1990)) (internal quotations omitted).

## III. Analysis

### A. Consideration of Facts in Arije's Response to the Motion

Pointcross first argues that the Court should ignore the newly alleged facts and decide the motion solely based on the single-paragraph Complaint. (Reply Mot. Dismiss at 2–3, ECF No. 31.) Ordinarily, a party cannot amend its pleading through its briefs. *See Saunders v. Keenan*, Civ. No. JKB-15-1265, 2015 WL 4622492, at *1 (D. Md. July 31, 2015). However, as part of the "duty to construe *pro se* pleadings liberally," courts may consider allegations in a response to a motion to dismiss, even if they were not included in the original complaint. *Higgs v. Airframe Modification Prof'l Mechs., Inc.*, Civ. No. JKB-10-2379, 2011 WL 1637637, at *2 (D. Md. Apr. 29, 2011). Both cases Defendant cites to argue *against* considering Arije's opposition brief actually *confirm* courts' authority to do so. *Gough*, 2018 WL 4567112, at *2–3 (recognizing that courts "may consider additional facts and information supporting the complaint . . . provided in an

opposition to a motion to dismiss," but dismissing a *pro se* claim that was insufficient even after doing so); *Rush v. Am. Home Mortg., Inc.*, Civ. No. WMN-07-0854, 2009 WL 4728971, at *3 (D. Md. Dec. 3, 2009) (considering new facts alleged in an opposition brief "to the extent that the additional facts support [a *pro se* plaintiff's] existing claims").

The Defendant argues that, notwithstanding this general practice, it should not apply here, because the new facts alleged in Arije's response "alter[] the Complaint" but do not make it "clearer." (Reply at 3.) The Court disagrees. The new factual allegations are entirely consistent with the bare bones claim set forth in the Complaint: that Arije's negative performance evaluation and subsequent termination were products of race-based discrimination and did not reflect his actual performance in his job. The additional facts also provide new details clarifying the terms of Arije's employment with Pointcross, his responsibilities, his performance history, his relationship to other employees, and the timing and circumstances of both the negative evaluation and his termination. Although courts have refused to consider entirely new claims put forward in a *pro se* response, *see Rush*, 2009 WL 4728971, at *3, there are no such new claims here. The Complaint referred to racial discrimination in termination and "hostile conditions" of employment, both of which are covered by 42 U.S.C. § 2000e-2(a)(1).[3] (Compl. at 2.) The facts alleged in opposition do not purport to introduce any causes of action beyond these. Thus, the Court sees no basis for ignoring the facts Arije alleged in his response brief. This conclusion is bolstered by the fact that Arije could have formulated the new allegations as a motion to amend, which the Court would have considered under Rule 15's liberal standard favoring amendment. Fed. R. Civ. P.

---

[3] Defendant's motion argues that the Complaint is fatally deficient because Arije does not specifically "identify which provision of Title VII is implicated," therefore leaving Defendant "to guess what legal theories support Plaintiff's allegations . . . ." (Mot. Dismiss at 1.) Although Arije does not cite to any subdivision of Title VII by number, his Complaint alleges racial discrimination in termination and working conditions. (Compl. at 2.) It takes minimal guesswork to surmise that these claims refer to 42 U.S.C. § 2000e-2(a)(1), Title VII's main operative provision, which prohibits employers from "discharg[ing]" or "discriminat[ing] against any individual with respect to . . . conditions . . . of employment, because of such individual's race . . . ." *Id.* This is sufficient to identify his claims.

R. 15(a)(2) (obliging courts to "freely [grant] leave [to amend] when justice so requires"); *see also Smith v. Blackledge*, 451 F.2d 1201, 1202–03 (4th Cir. 1971) (holding that a filing by a *pro se* plaintiff to "further particularize" the complaint should have been treated as a motion to amend).

Therefore, the Court will consider allegations in both the Complaint and Arije's response brief in deciding whether Arije stated a plausible claim.

### B. *Sufficiency of Allegations*

Next, Pointcross argues that, even considering the new facts, Arije failed to allege the elements of a prima facie case of discrimination, as defined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973). (Mot. Dismiss at 4–5.) This argument misstates the pleading requirements for a Title VII claim.

*McDonnell Douglas* outlines "an evidentiary standard, not a pleading requirement." *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 510 (2002). At the motion to dismiss stage, the appropriate standard is whether a plaintiff's factual allegations and the favorable inferences reasonably drawn therefrom give rise to a plausible right to relief. *Lowman v. Md. Aviation Admin.*, Civ. No. JKB-18-1146, 2019 WL 133267, at *5 (D. Md. Jan. 8, 2019) (citing *Woods v. City of Greensboro*, 855 F.3d 639, 648 (4th Cir. 2017)). Although the elements of a prima facie case may be "helpful in analyzing . . . plausibility," *Brown v. Hous. Auth. of Balt. City*, Civ. No. MJG-16-3616, 2017 WL 3189447, at *5 n.5 (D. Md. July 26, 2017), a plaintiff is not required to plead facts establishing a prima facie case to survive a motion to dismiss. *Swierkiewicz*, 534 U.S. at 511; *Lowman*, 2019 WL 133267, at *5.

With this standard in mind, the Court concludes that Arije sufficiently pled a claim of discriminatory discharge under § 2000e-2(a), but that he failed to state a claim for hostile working conditions.

### i. *Discriminatory Discharge*

The elements of a prima facie case for discriminatory discharge—which are helpful in evaluating a motion to dismiss—are that "(1) [Arije] is a member of a protected class; (2) he was performing his duties in a satisfactory manner; (3) he was subjected to an adverse employment action; and (4) . . . circumstances surrounding the adverse employment action rationally support the inference that the adverse employment action was motivated by unlawful considerations." *Chika v. Planning Research Corp.*, 179 F. Supp. 2d 575, 581 (D. Md. 2002) (citing, *inter alia*, *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995)). Liberally construing the allegations of the Complaint and the response brief, the following picture emerges: that Arije is an African-American man who worked for Pointcross in a capacity where most of his peers were not African American; that he received consistently positive performance-based feedback from superiors for the majority of his employment, including being entrusted with a job requiring a high degree of skill and proficiency; that, when subjected to scrutiny by co-workers and superiors in open reviews, his work had fewer data errors than the work of peers who were not African American; that Arije was nonetheless given a negative performance evaluation, the accuracy of which he contested; that the supervisor primarily responsible for the substance of the evaluation had previously expressed animus towards Arije; that unidentified employees of the company had a history of mispronouncing Arije's name so that it sounded like a racial slur; and that he was thereafter terminated from employment on the same day that another African-American subject matter expert was also discharged.

The Court acknowledges that this case presents a close call. However, to survive a motion to dismiss, Arije need not establish that invidious discrimination is the *most* plausible explanation, or even that it is *more* plausible than some alternative explanation the Defendant might offer. At

this stage of the proceedings, the Court will not make factual determinations, *In re Royal Ahold N.V. Secs. & ERISA Litig.*, 351 F. Supp. 2d 334, 376 n.32 (D. Md. 2004), and the Court will not weigh competing inferences, *Ibarra*, 120 F.3d at 474. Considering the facts and inferences solely in the light most favorable to Arije, the Court concludes that he pled sufficient facts, albeit barely, to give rise to a plausible inference that Pointcross discriminated against Arije based on his race when he was discharged from employment. Accordingly, Defendant's motion will be denied.

### ii. *Hostile Working Conditions*

Arije's Complaint also refers to "hostile conditions." (Compl. at 2.) Hostile working conditions are actionable under Title VII when "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations omitted) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)). The conduct at issue must be "severe or pervasive enough to create an objectively hostile or abusive work environment" that is also "subjectively perceive[d]" by the plaintiff as abusive. *Id.* Determining whether a work environment is objectively hostile or abusive requires consideration of "all the circumstances," e.g., "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. A single, "'isolated incident[]'" can create a hostile work environment "if that incident is 'extremely serious.'" *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (en banc) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998)).

Arije's sole allegation related to this claim is that Arije "took offense" to the way that unidentified Pointcross employees "often pronounced [his name as] 'Coon-le' with an over

emphasis on the first syllable[,] . . . which is reminiscent of a racial slur." (Compl. at 2.) Under Supreme Court precedent, the "'mere utterance of an . . . epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII," *unless* it is severe or pervasive. *Harris*, 510 U.S. at 21 (alterations in original) (citations omitted) (quoting *Meritor Sav. Bank*, 477 U.S. at 67). Use of an "unambiguously racial epithet," even an isolated use of one, can be so severe that it alone creates a hostile working environment, especially if used "by a supervisor in the presence of his subordinates." *Boyer-Liberto*, 786 F.3d at 280 (quoting *Spriggs v. Diamond Auto*, 242 F.3d 179, 185 (4th Cir. 2001)); *see also id.* (collecting cases in accord from the Second, Eight, Ninth, and D.C. Circuits).

Had Arije alleged that his co-workers blatantly called him "coon"—a term with clearly racist connotations and a history of discriminatory use—this case might have been in *Boyer-Liberto* territory, where even a single use of such an unambiguous slur could be severe enough to create hostile working conditions. Here, however, Arije's allegation—that his name was "often" mispronounced in a way that was "reminiscent" of the slur (Compl. at 2)—is, at most, ambiguous. He failed to allege facts from which the Court could plausibly infer that, when his name was mispronounced that way, it was clearly understandable as a racial slur.

For example, Arije failed to allege facts suggesting that the mispronunciation was so obviously or egregiously incorrect that it could not reasonably have been a mistake. He did not allege the proper pronunciation of his name, only that the error was a matter of the incorrect "emphasis" on the wrong syllable (*id.*)—a difference that could be exaggerated or could be subtle. Nor did he allege facts about the context of the mispronunciations. If the practice continued after he corrected his colleagues or alerted them that he considered it offensive, or if a mispronunciation was used in a reprimanding or taunting manner, such contextual factors could have suggested a

10

knowing or intentional attempt to insult or demean. But, Arije does not say how or when it was used. The only detail Arije provided was that the mispronunciation occurred "often." (*Id.*) But, he did not allege how frequently, or whether it was a single individual or a widespread group who engaged in the practice. Nor does he identify whether the offending parties were supervisors, peers, or subordinates, factors that impact severity. *Boyer-Liberto*, 786 F.3d at 278 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 724, 763 (1998)) ("In measuring the severity of harassing conduct, the status of the harasser may be a significant factor . . . [because] 'a supervisor's power and authority invests his or her harassing conduct with a particular threatening character.'"). Based on the allegations currently before the Court, there are simply too many unknown variables.

Scenarios in which a mispronounced name could be used to signal a racially derogatory connotation or otherwise foster an abusive or hostile environment are certainly possible. A shift in emphasis, especially if exaggerated, repeated, or used in a pejorative context, can significantly change meaning, enough to transform a first name into something akin to an "unambiguously racial epithet." *Id.* at 280 (quoting *Spriggs*, 242 F.3d at 185). The Court cannot rule out the possibility that Arije was subjected to such odious treatment here. However, the mere *possibility* that the mispronunciation of his name was used in this way is not enough to state a claim. *Iqbal*, 556 U.S. at 678. Without any additional facts, the Court simply cannot infer that it is *plausible* that the conduct alleged was so severe or pervasive as to create an objectively hostile environment.[4]

Additional allegations in the response brief do not alter this conclusion. Although Arije alleged that his supervisor engaged in unpleasant behaviors—including habitual lateness, yelling

---

[4] Because the Court concludes Arije failed to sufficiently allege the first prong under *Harris*, conduct creating an "objectively hostile or abusive work environment," the Court need not decide whether Arije's allegations satisfy the second prong, that is, whether Arije "subjectively perceive[d]" the conduct to be abusive. *Harris*, 510 U.S. at 21.

11

at employees, and gesturing with her middle finger (Opp'n Mot. Dismiss at 2–3)—Arije does not allege any facts suggesting a discriminatory motive or effect. Rather, his allegations suggest these behaviors were targeted at employees generally, not at a sub-set of employees based on race or at Arije individually. (*See id.* (describing Johnson as yelling at unidentified "employees" and arriving late to "meeting[s] while everyone else was present").)

Therefore, to the extent Arije's Complaint alleges a violation of Title VII based on hostile working conditions, that claim will be dismissed.

### *IV. Conclusion*

For the foregoing reasons, an Order shall enter granting in part and denying in part the Defendant's motion to dismiss. The motion will be granted with respect to Arije's hostile working conditions claim but denied with respect to his discriminatory discharge claim.

DATED this *15* day of February, 2019.

BY THE COURT:

_____
James K. Bredar
Chief Judge